First, I wanted to thank the administration of John Marshall Law School for having us for hosting this session of the Federal Circuit, and we enjoy being here in Atlanta, although the weather has turned on us and it's no longer sunny, but it's still sunny in here. We have this morning five cases before this panel. Two of the cases are being submitted on the briefs. They will not be orally argued. Those two cases are for the record 2010-1362 McLennie v. Stoll, which is a patent case, and that's been submitted on the record. The second case is 2010-7115 Cockrell v. DBA, and that's another one of our cases under our jurisdiction dealing with Veterans Affairs. This morning there will be three orally argued cases, two patents, and one international trade case. The first case up before the bar is 2010-1002 Rembrandt Data v. AOL. And Mr. Pizzuniac, did I pronounce it correctly? That's correct, Your Honor. You've reserved five minutes for rebuttal. That's correct, Your Honor. Anytime you're ready. May it please the Court, this is George Pizzuniac for Appellant Rembrandt Data. The first issue that was raised in the briefs is the issue of the so-called Connexent license or whether Connexent had a license. The appellees had the burden to prove a license. They did not. So why isn't this 1995 agreement sufficient? Because the 1995 agreement permitted only the old Rockwell to issue a license to their spin-off, new Rockwell. But didn't the 1988 agreement provide old Rockwell with that license? The 1988 agreement provided old Rockwell with a license, but old Rockwell had no right to assign that license to a spin-off or sub-license a spin-off. The 1995 agreement provided for the right of old Rockwell to sub-license a spin-off. New Rockwell. And that was the new Rockwell. So why didn't it also give new Rockwell the ability to sub-license Connexent? Because it is an established rule of law that a non-exclusive patent licensee has no right. Yeah, but the question is, that's not the issue. The issue is what did the agreement provide and did the agreement give them the right to sub-license? If Your Honor looks at the specifics of that 1995 agreement, it is very specific to allowing old Rockwell to sub-license only once, and that is to the spin-off, because it is only the right to sub-license. The language at the bottom of the first page, the licenses and rights granted in this agreement may be sub-licensed to any future divested present business of Rockwell. That's correct. Why isn't Connexent a present business of Rockwell? Because the present business of Rockwell was old Rockwell, and they had the right to sub-license this only once, and that was to a divested entity. Where does it say only once? Well, there's no provision for a second one, and if there is no provision for a second one... Suppose there were two spin-offs that happened at the same time, and they wouldn't be able to sub-license both spin-offs? Yes, they could, if there were, if old Rockwell did so. But again, coming back to what I think is still the established law, your rights as a non-exclusive sub-licensee are expressly limited to only that which is in the contract. Well, that's the question. The question is what's in the contract. Well, in the contract it does say very clearly to such sub-licenses may be granted, well, it is a license to the future divested present business. Why doesn't the future divested present business of Rockwell include Connexent? I mean, the Connexent business was at that time a business of old Rockwell, right? There was a lot more to it, because you had the old Rockwell, which spun off into multiple different groups, one of which was new Rockwell. New Rockwell developed new technologies, it was part of a much larger entity, and then they spun off that group off to Connexent. But there is, again, what I come back to is where is the, if you are a non-exclusive sub-licensee, you have only those rights. And unless new Rockwell was given the opportunity to transfer a sign or sub-license in the agreement, it has none, because a mere non-exclusive licensee under a patent law does not have any right to transfer. And that has never been disputed. Your argument seems to me to be going around in circles, because we're all, I think, in agreement that this right has to be found in the agreement itself. But the argument is why, despite the multiplicity or the complexity of the spinoffs, why is Connexent not a business component that was provided for in that contract, which would provide the necessary contractual permission for this to extend, for the license to extend to Connexent? Well, because, maybe I should approach it this way, you have three separate entities. You have the old Rockwell, you have the new Rockwell, and then you have Connexent. Where is the authority? We agreed that there was authority for old Rockwell to sub-license new Rockwell. But where is the authority for new Rockwell in the 1995 agreement or anywhere else? But your problem is you're not addressing the language. The language says, any future divested present business of Rockwell, and Connexent, the business that became Connexent in the future, was at that time a present business of Rockwell, right? Yes. Well, so that's the problem. But, again, the agreement says the licenses and rights may be sub-licensed to any future divested present business of Rockwell, that is, of old Rockwell. So, it only goes to the future divested present business of old Rockwell. There is no provision here. You just agreed that Connexent was part of old Rockwell. No. No? No. No, the old Rockwell was one entity. Oh, it's a different entity, but the business is the same. The business that became Connexent was part of the old business of old Rockwell, right? All we can say is that all three entities were in the general line of business, but I don't think we can say that it's the same business because the business grew between the time of the original license to the first divestment to the second divestment. So, it's not the same business. It is the same general line. I'm sorry, Your Honor. The 1996 agreement provided for an assignment, and if that assignment was properly done, would that also transfer the license to new Rockwell and to Connexent at the same time? No, and there are several answers to that. There is no record of any assignment of the 1988 patent license agreement to new Rockwell. We have a record that the assets, including the intellectual property assets, related to the new Rockwell spinoff went to new Rockwell, but the agreement itself, the entirety of the 1988 agreement, was never assigned to new Rockwell, and there's no evidence of that. In fact, this was one of the errors that we pointed out in the district court. But do we care about that? If the 1995 agreement gave it the right to sublicense, we don't care whether the 1998 agreement was assigned or not, do we? That's correct, Your Honor. We don't care about the assignment. If new Rockwell had a right to do a second sublicense, and our position is that patent licenses are personal, and therefore if the patent owner allows only a divestment or the provision provides the license to go to only the a-divested entity, it stops there. There is no further provision for sublicensing it to yet a third entity. And I don't believe that such a ruling would be consistent with the established law that patent licenses are personal and cannot be transferred without the patent owner's consent. And this agreement, the 1995 agreement, certainly does not clearly or even inferentially, I think, provide that consent for the second tier entity to transfer to a third tier. So I just realize I'm up to my ten minutes. Your Honor, if you don't have any more time, do you want to try to save it? Yes, Your Honor. Good morning, Your Honor. May it please the Court. I'm Michael Songer for the Appelese-Cannon and Hewlett-Packard. The flaw in the argument on the license issue is simple. Rembrandt says that the old Rockwell to new Rockwell was a sublicense, and it was not. It was an assignment. And that is clear at 13170 in the record. Why don't you address the language of the 1995 agreement? The language is... You've been asking questions about it. Do you agree that that provides the right to sublicense connection? Absolutely. It's clear as a bell in there. It gives the right for connection to take the sublicense subject to several conditions, one being that it continue in the business. Old Rockwell did, among aerospace and defense, have a very large semiconductor division that eventually became connection. So that is the point. And the agreement up front, when the restructuring of Rockwell took place at 13170, they referenced the 88 agreement and the 95 agreement, and they make clear that Rockwell is assigning its rights under those contracts as is allowed in the 88 agreement. It's assigning its rights over to new Rockwell. And then, as you pointed out, new Rockwell under the 95 agreement had the right to sublicense, and that came later through the connection agreement. So there was no sublicense from old Rockwell to new Rockwell. That was an assignment, and then the sublicense came later. What difference does it make? Are you saying that you lose if it was a sublicense rather than an assignment? No, I'm not. I just wanted to clarify the point, Your Honor. I just wanted to clarify the point. Just to complete that point, are you also saying that it's important for us to conclude that there was an assignment from old Rockwell to new Rockwell? No, it is not. What is clear is the 95 language, which broadened the 88 agreement to allow for a sublicense. So your position is that the 95-letter agreement is enough in and of itself? It is, but we also have the assignment that took place. All right. That's my position. Could you turn to the validity question with respect to Claim 3? Claim 3 of the 236 patent? Of the 236 patent. The improperly drafted claims? Yes. Yes, I can. As is pointed out in those claims, it mixes the apparatus claims with the method part of transmitting, and the court found, and we agree that this was not, as this court's standard is, an obvious error or some type of typographical error. And, indeed, the claims have the type of correction that this court can do where they refer to a steam of bits. Well, that's a stream of bits. Everyone knows that. Would you agree that the test is the test set forth in the Dovo Industries, that the court can correct a mistake if it is not subject to reasonable debate based on claim language and the specification? I would agree with that and also add, as long as the prosecution history doesn't support something to the contrary as well. Okay. I agree with that as well. But the question then becomes, is this mistake, the correction thereof, not subject to reasonable debate? It is subject to reasonable debate, and I'll show you how. In what way? How can it mean anything other than a device for transmitting the trellis-encoded frames? Because the debate comes in where the transmission occurs and what the device is. There's the data transmission means and the trellis encoding. And if you look at Figure 1 of the patent, you see a trellis encoder, which transmits to a QAM transmitter, which transmits out the signal. And I would say to you, well, which transmission would the rewritten claim refer to? The transmission between Block 20 to 22 or the data transmission out on 24? It is not clear if you add the language as suggested in claims, dependent claims 7 and 8, that this would make it clear which transmission is referring to. With respect to Claim 1, that claim parallels Claim 3, it seems to me. And Claim 1 concludes with the limitation, a transmitter section for transmitting the trellis-encoded frames. How do you interpret Claim 1? What does that read? I would say that the transmitter section for transmitting the trellis-encoded frames is the data that comes out of trellis encoder 20. So the transmitter section would be the QAM transmitter 22? That would be the data transmitting device for transmitting the signals. That would come out on 24 in Figure 1. So in Claim 1, the transmitter section merely says that your trellis encoder, because it is the transmitter section for transmitting the trellis-encoded frames, that's what comes out of the trellis encoder. But for the preamble of Claim 3, you have the data transmitting device for transmitting signals. And if you're adding it in for just the transmission part, I wouldn't understand why it would not come out of 24 or 22. And that ambiguity would be there. But does that bring us to the point where Claim 1 and Claim 2 then should be reviewed and held valid? Because they don't have the same limitations as Claims 3 through 11. That's right. I would invite that based on the indefiniteness as to what is doing the transmission, yes. That issue, of course, wasn't raised below because we focused on the mixed apparatus and method claims. Only for Claims 3 through 11? 3 through 11. 1 and 2 seem to have been thrown in by the court just as a matter of fact. I don't think so. There were different means for invalidating all of the claims on the means plus function elements, the first buffer means, second buffer means, and going on from there. But not because it was a mixture of methods plus apparatus? No, Your Honor. That's only Claims 3 through 11. That's only Claims 3 through 11. And the theory with respect to Claims 1 and 2 is that there isn't any structure shown for buffer means and combining means? That's it. Among other things, yes. There's no structure for the first buffer means, which does the partitioning, and the second buffer means, which does the combining for both of those as well as a format selector means. Mr. Sanger, turning again to Claim 3 and that last limitation, did you say a moment ago that the confusion, the ambiguity here, trying to correct this, is that we don't know what the device for transmitting the trellis encoded frames might be, and that it might be the trellis encoder 20 or the QAM transmitter 22? Yes. Is that right? Yes. But it can't be the trellis encoder 20 because that's what's recited in the preceding limitation. The preceding limitation just say you trellis encode it. It says trellis encoding means for trellis encoding the frame. That's item 20. Right. So the last limitation can't be that same limitation. It is the arrow output from item 20. It's not what goes on in the box, but it's the output, the transmission. The claim would say they want a transmitting device for transmitting it out. So the device would be in the box, and then the effect would be the output coming out. I can understand your interest in trying to parse this out that way, but I think reading the specification fairly makes it difficult, at least for me, to conclude that it is anything other than simply a mistake that should read the device for transmitting the trellis encoded frames or consistent with the defendant claims a transmitter section, which would also draw in the parallel with claim one. Well, you have the situation where these claims weren't amended. They sailed through. This is as they were drafted, and they sailed through the patent office in this form. So this was all the way going through. So you don't have a situation. You're just arguing it based on the final claims that came through. And I would suggest that if you open this door, then you will get many arguments on something not that is a mixture of method and claim that say, well, we really meant this, and it would go beyond claim interpretation. I don't think this kind of mistake doesn't happen that often, does it? I would hope not, Your Honor. I would hope not. The person who taught me how to draft patent claims would be upset if I did that. I mean, there are a lot of mistakes in this patent. There are typos all through the patent. So, I mean, maybe this qualifies for a sort of sloppiness exception. Well, I would submit not, Your Honor. Do we have to reach these invalidations that we hold for you in the sublicense? No, no. The way the case has progressed, the only modem chipsets that are at issue for both Cannon and Hewlett-Packard are the Connexin chipsets. So if you find that the license applies, you do not need to reach any of the other agreements. Even with respect to Claims 1 and 2? Even with respect to those claims. It is clear, and no one has disputed, that these two patents are covered under the license agreements that are out there. That's clear from both the 88 and the 95. And, in fact, when Rembrandt acquired the patents from a later entity zone, it's spelled out as these are the patents, and they take them with notice of the 88 agreement. Is there a cardinal chemical issue here? I mean, if we find there's no infringement based on the exhaustion, nonetheless we have a district court opinion that says these claims are invalid. We should simply let that sit? I would think they would be mooted. I don't think we have the cardinal chemical issue. Do you think they would be mooted? From the decision that you make, you would not have to reach the decision as to the invalidity of the claim. Because the invalidity is asserted as a defense rather than a counterclaim? I assume they were asserted as both, Your Honor. We certainly asserted it as a defense, and honestly I don't recall whether we asserted it as a counterclaim. My understanding is that it was asserted both ways as a counterclaim as well. So you'd have the counterclaim standing with a holding of invalidity. I understand the point. In that case then it would have to be addressed because then we'd have to go back down and deal with it at that time because it would be an open issue. We would have to address. We would not have a final decision. I'm sorry, Your Honor. Would we have to address just claims one and two or all of them? I would think you would have to address all of the claims because there's a finding from the district court of invalidity based on all of the claims based on not properly setting forth an algorithm for the structure. But Cardinal Chemical is a case in which the accused infringer wanted the invalidity issues decided, right? Right. And you're saying you don't care. We do not care about that. And if it happened, if it was sent down to the district court, we would just simply, with the license in place, we would move to dismiss it or dispose of it that way because, again, we would have the license issue. Would that leave the issue of validity wide open then with respect to any future litigation that they might have? There would be a finding. It might because there would be a finding from the district court that depending on how Your Honors wrote your decision, there would be a finding from the district court as to invalidity. So it might be there. Now, these patents will expire soon. It's a practical effect. This may not be exactly a Cardinal Chemical situation, but certainly if there's a counterclaim, it seems to me that the issue then is not looted and is wiped and would have to be decided. Right, would have to be decided. I agree with that, Your Honor. The last point I would want to make on the patent issues turning to the invalidity argument about the buffer means is that when you get into the issue of whether it should be interpreted as means plus function, the experts were clear. Rembrandt wants to say that, well, one of ordinary skill would read this and find it, but that's not the case. We have a battle of the experts that's going on here. Our expert has said, reading this specification, and this is at 11260 in the record, reading the specification, I'm an expert, and I can't figure out how you do this. There is no ordinary skill in the art. I can't figure out how it's done reading it. That was for the first buffer means, and he also said it at 11264 for the second buffer means. Just to add that clarification. Thank you. Thank you. In response to the statement that there is an assignment, in fact, there is no record of an assignment of the entire PLA, only the assignment of those rights that are related to the divested entity. However, in response to Your Honor's question regarding do we need to go beyond the sublicense or finding the issue as to the 1995 sublicense, there is a second issue, even if we assume that, and that is that the license went only to the future divested present business of Rockwell and only extended to products and services sold by the future divested business prior to its divestiture. Well, it's sort of hard to believe that the reference to products was to the precise product being produced at the time of the divestiture. It must be somewhat broader than that. Well, it might be somewhat broader. It might be equivalence to the products that were sold at the time, but there's no suggestion that the present products that are in issue today are the equivalence of what was sold before. It seems to me this was an argument you didn't raise in your opening presentation and is not properly rebuttal. Your adversary doesn't have an opportunity to respond. It was made in the briefs. I'm not saying it's not an issue in the case. I'm just saying at this argument you did not raise that point in your opening argument. I'm not sure it's proper to comment on it now. I beg forgiveness, Your Honor, but we did raise that. I'm not arguing that it's in your briefs. It's certainly in your briefs and it's properly raised in your briefs. I'm just talking about the argument here. Oh, I'm sorry. I was trying to address that. To raise that issue on rebuttal puts your adversary at a disadvantage  I apologize, Your Honor. I thought I was trying to address that. Let me ask you a question regarding the royalties that have been paid. Yes. Have the Rockwell and the successors continued to pay royalties under the license? I don't know. There's no record to show that. That's one of the problems is that there is almost no record to support any of the conclusions. For example, we have made arguments regarding assignments. There's no record of any assignment. We don't have any record to compare the products that existed in 1995 or 1996 versus the product lines that Connexent now has. These are all gaps. Wasn't Old Rockwell in the motive business? Old Rockwell had many different businesses. But was motive one of them? Yes. They had avionics. So if we read product as broadly as type of product, like modem, it would be within that category, right? Yes. If one says modem is a modem and that's the product, then that's the end of that. However, that sort of makes the language sold prior to the divestment in the relevancy. In other words, if you make the term product so broad that it encompasses all elements. If you weren't in the modem business, it wouldn't include modems under that. That's correct. But, again, why use modems? Why not make it even more generic and say electrical appliances or communication systems? In other words, the only way to give life and meaning to the term sold prior to divestment is to refer to the products that were actually at the time. Precise products? Or their equivalents. That's correct. What does that mean? Are there equivalents? In other words, products that did the same thing but under a different brand name or a somewhat different thing. But that's not an issue here. Your Honor, I do want to address one further point, and that is on this sublicense issue. If you look at the agreement, this 1995 agreement, it does say may be sublicensed to any future divested present business of Rockwell. And the sublicense goes only to the divested company. So I think that the phrase present business further reinforces that there was only this one right to sublicense. And once that second tier license went into effect, the second tier company no longer had any right as a non-exclusive sublicensee to further transfer. My time is up. Thank you. Thank you, Your Honor. Before counsel leaves, we would like to have from counsel, since there's a lot of confidential material on the record, it would be difficult to write up an opinion in this case without knowing exactly what confidential material can be used and what can't be used. Would you clarify that jointly and let us know within seven days of today? We will, Your Honor. I thought we had a confidential appendix and a non-confidential appendix. We do, but you want to go beyond and cite information in the confidential. We will. May I ask, Your Honor, for your indulgence for ten days, only because I have to go chase down Lucer and some of the other companies. Ten days. That's fine. Thank you. We will. Thank you, Your Honor. The case is submitted.